MEMORANDUM OPINION


No. 04-03-00937-CR

Lydia Moreno ORTEGA,
Appellant

v.

The STATE of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2001-CR-4959
Honorable Bert Richardson, Judge Presiding
 
Opinion by:    Catherine Stone, Justice
 
Sitting:            Catherine Stone, Justice
Karen Angelini, Justice
Sandee Bryan Marion, Justice
 
Delivered and Filed:   March 16, 2005

AFFIRMED
            Lydia Moreno Ortega (“Ortega”) was convicted by a jury of five counts of injury to an elderly
or disabled individual and sentenced to ten years imprisonment. Ortega’s sentence was suspended,
and Ortega was placed on ten years community supervision. On appeal, Ortega presents four issues:
(1) her constitutional rights were violated because the trial court allowed a witness to invoke his
Fifth Amendment privilege and the trial court excluded certain evidence; (2) the evidence is factually
insufficient to support her conviction; (3) the trial court abused its discretion in admitting a civil
deposition into evidence; and (4) the trial court erred in refusing to submit a charge on causation. 
We affirm the trial court’s judgment.
Factual Sufficiency
            On September 20, 1998, a fire occurred at a residential facility for elderly individuals that
was owned by Ortega. Five residents of the facility, Ramona Martinez, Rosa Borja, Dalton Albright,
Charles Pitts, and John Connor, died from injuries sustained in the fire or from complications from
those injuries. A jury found Ortega guilty of five counts of injury to an elderly individual by reckless
omission. Ortega challenges the factual sufficiency of the evidence to support her conviction.
            In a factual sufficiency review, we must consider all of the evidence to determine whether
the judgment is “so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.” Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). We are not permitted to
reweigh the evidence, rather we defer to the trier-of-fact’s findings, particularly those based on
credibility determinations. Cain v. State, 958 S.W.2d 404, 407-09 (Tex. Crim. App. 1997).
            The evidence is undisputed that Ortega did not obtain a license to operate her facility. 
Jacquelyn Guise with the Texas Department of Human Resources (“Department”) testified that
facilities housing four or more residents were required to be licensed. In April of 1991, Ortega’s
facility was first documented as being unlicensed in violation of the Health and Safety Code. In
response, Ortega applied for a feasibility study, but Ortega’s facility did not meet licensing
requirements because of twelve deficiencies. In addition, the feasibility report noted that the survey
was not made for a type B facility, which would house residents not capable of evacuating the
facility unassisted. If the facility was classified as a type B facility, a sprinkler system would be
required in addition to correcting the twelve deficiencies. In February of 1992, Ortega responded
with a letter stating that she intended to pursue licensure of a type A facility by correcting the twelve
deficiencies within six months. 
            In July of 1992, Ortega requested a six month extension. On July 24, 1992, an inspection
was performed in response to another complaint, and several deficiencies were noted. In February
of 1993 and May of 1993, additional complaints were investigated regarding Ortega operating an
unlicensed facility. In October of 1993, Ortega faxed a request for an additional ninety day
extension. In November of 1993, Ortega’s facility was investigated, and it was determined that no
residents were living at the location. 
            In December of 1994, another complaint was filed that Ortega was operating an unlicensed
facility, and an inspection revealed: (1) two of the six residents were inappropriate for Ortega’s
facility because they could not evacuate the facility unassisted in the event of an emergency; (2) the
windows had burglar bars, and the owner was unable to locate the key; and (3) trash and other
obstructions were piled along the perimeter of the house. Guise made a note to refer the facility to
the Attorney General’s office, but in March of 1995, Guise’s supervisor directed her to obtain a
current report before referring the facility to the Attorney General. 
            The next investigation occurred in May of 1995 in response to additional complaints,
including the facility not being licensed. Ortega contacted Guise and reported that she had installed
a fire panel and only needed to complete a few more repairs. Ortega explained that the residents who
were inappropriate for the facility were only being housed at the facility temporarily for
approximately two weeks until the plumbing at another facility could be repaired. In July of 1995,
Ortega contacted Guise requesting an additional two month extension. At that time, Guise instructed
Ortega that she needed to submit an application for licensing. In April of 1996, a letter was sent
requesting an update, but no response was received. 
            In August of 1997, an unannounced visit was made to the facility at the request of the State
office licensing section for verification status. The facility was still unlicensed, and no application
had been submitted. In October of 1997, Ortega called Jeannie Pate in response to a letter from Pate
noting Ortega’s continued violation and informing her that the Department had the authority to refer
the matter to the Attorney General for legal action. Ortega told Pate that she had installed a fire
alarm system, a fire panel, and a new roof over a room addition. Ortega also stated that she had
purchased self-closing door hinges. In response, Pate sent her an application for licensing. 
            On January 8, 1998, a complaint investigation was conducted at Ortega’s facility. The
facility continued to operate without a license and with inappropriate patients for a type A facility. 
In February of 1998, Pate made a request to have the facility inspected. On March 13, 1998, a memo
was sent to Lonnie Duke, an attorney at the office of the general counsel for the Department,
requesting that the Attorney General pursue civil penalties for continued non-compliance. Duke
referred the facility back to the Department, noting that facilities that do not immediately threaten
the health and safety of the residents must first be referred to local authorities based on legislation
that was passed in 1997. Duke stated that the legislation was passed to provide an alternative means
to seek legal actions because the Attorney General’s office would only pursue unlicensed facilities
that posed an immediate threat to the residents. Duke stated that the fire hazards and the housing
of inappropriate patients would not qualify as an immediate threat to justify sending the case to the
Attorney General’s office. At the time Duke referred Ortega’s facility back to the Department, a
policy had not been finalized for referrals to local authorities. 
 
            On September 21, 1998, Pate received an e-mail notifying her about the fire at Ortega’s
facility and learned that residents had perished in the fire. A memo was sent to the office of general
counsel requesting that Ortega be referred to the local prosecuting authority. 
            Cecilia Martinez supervises the Department’s investigators or surveyors. Martinez testified
that type A facilities house residents who are mentally and physically able to evacuate a facility
without assistance. A patient who requires assistance in being transferred from his bed is not
appropriate for a type A facility. Type B facilities can house patients requiring assistance in
evacuating but are required to have an alarm system and a sprinkler system, and fire drills must be
conducted four times a year. Type B facilities also must have a written contract with a licensed fire
alarm company. Martinez stated that it would be inappropriate for a facility to leave six elderly
individuals in the care of a person who was not trained in home health care or was not a certified
nurse’s assistant. 
            Other witnesses, including Orlando Hernandez, the program manager for the fire marshal’s
office, and Jesse Sanchez, Jr., who was a fire inspector for hospitals and nursing homes at the time
of the fire, also testified regarding the violations that existed at Ortega’s facility, including: (1) the
failure to comply with the requirement that one window in each bedroom be available as a secondary
exit; (2) the failure to comply with licensing requirements; (3) the obstruction of an exit pathway
from the windows by appliances, tables, and other storage; (4) the failure to undergo a fire inspection
which would have required a fire drill to be conducted in the inspector’s presence to determine if
patients could be properly evacuated; (5) the failure to have the fire alarm system inspected quarterly
and monitored by a licensed company; (6) the failure to have a sprinkler system; (7) the failure to
have smoke separation between the living areas and sleeping areas; (8) the failure to conduct fire
drills; (9) the failure to have a door handle on one of the bedroom doors and the blockage of that
door by a dresser; (10) the absence of self-closing devices on the doors; and (11) the failure to have
an emergency plan posted. Both Hernandez and Sanchez testified that sprinkler systems were
effective in saving lives. Hernandez and Sanchez testified that a sprinkler system would have
contained the fire at Ortega’s facility.
            Ralph Kelly, a seven year veteran fire fighter, assisted in evacuating the residents from the
facility. At one point upon reentering the house, Kelly heard moaning. Although Kelly could see
some type of opening, there were no door knobs, door handles, or hinges. Kelly and another fire
fighter pushed at the opening and discovered a wheelchair and a dresser half blocking a door. Kelly
stated that a lot of “old trash and junk” was piled up that made it difficult for the fire fighters to get
to the house from the side. David Ruiz, an eight year veteran fire fighter, stated that one of the
residents was heavy and required two fire fighters to carry him.  
            Norm Riebe, a paramedic who responded to the scene, treated Dalton Henry Albright. 
Albright suffered burns to forty to fifty percent of his body. Albright was conscious and told Riebe
that some of the doors were locked at the house during the fire. 
            Jose Salame, an arson investigator, was called to the scene because a death had resulted from
the fire. When Salame arrived at the scene, only the deceased victim remained; the other residents
had been transported to the hospital. Salame spoke with several neighbors and fire fighters and was
told that no one heard any fire alarms inside the house. Ortega stated that the alarm system had been
going off on its own pretty regularly and the neighbors had complained, so she was having it
repaired. Salame admitted that he did not document any information regarding the fire alarm in his
report. 
            Salame spoke with Ortega and obtained information regarding the individuals who had been
living in the house. Ortega told Salame that John Lawson was left in charge of the facility. Salame
walked through the house a second time and determined that the fire started in the second bedroom. 
Salame observed smoking materials, i.e., ashtrays and cigarettes, in the first bedroom. 
            When Salame first spoke with Lawson, Lawson told him that a man named Paul had been
looking for Ortega about a job. Lawson stated that the man returned around 2:00 a.m., but Lawson
told him Ortega was not there. After closing the door, Lawson heard something on the side of the
house by the second bedroom. Lawson looked in the room and saw the man standing at the window
like he was trying to get inside the house. Lawson told him to leave, and he did. Lawson stated he
found the fire a short time later.
            Sometime later, Salame and his supervisor, Captain Sano, jointly interviewed Lawson. 
Lawson showed them the den where he had been lying down at the time the fire started. Salame
observed styrofoam cups full of cigarette butts on the floor and a styrofoam cup with a pack of
cigarettes and a lighter. Lawson began changing the story he initially told Salame, stating that the
man had not returned to the house a second time. Salame missed portions of the interview because
he repeatedly had to escort Ortega outside of the house so she would not disrupt the interview. 
When Salame returned, he heard Lawson tell Captain Sano he was in the second bedroom smoking
when he fell asleep. When he woke up, the blanket covering him was on fire or smoldering. Lawson
went to retrieve a fire extinguisher but could not make it work. When he returned, the room was in
flames, so he ran to try and get help. Realizing the time, he returned to the house to call the fire
department. Salame was not certain whether Lawson’s admission to causing the fire occurred before
or after Captain Sano suggested the fire could have been an accident. Lawson did not have any
visible injuries. Salame stated that the following information would have been significant in the
investigation: (1) Lawson’s mental health issues and failure to take medication; (2) Lawson’s having
auditory and visual hallucinations commanding him to set fires; and (3) Lawson serving a sentence
for an arson conviction for setting fire to a housing facility for elderly residents on the two year
anniversary of the fire at Ortega’s facility. Notwithstanding that information, Salame still did not
believe the fire at Ortega’s facility was the result of arson because the pattern of the fire and smoke
demonstrated that it was a smoldering fire. Although Salame and Sano requested that Ortega provide
a statement the following day, Ortega’s father called and stated that he had hired an attorney and that
Ortega would not provide a statement.
            Captain Sano testified that Lawson initially told him he thought the man who came by the
house looking for Ortega earlier had started the fire. Sano tried to get a description of the man, but
Lawson’s story was confusing because he kept changing it. Sano decided to have Lawson walk him
through the events of the evening. Lawson finally admitted that he had been smoking in the second
bedroom and fell asleep. When he woke up, he had started a fire. He went to the kitchen to get the
fire extinguisher, but he could not get it to work. Sometime later, Lawson called 911. Sano stated
that Lawson’s second version of the events was consistent with the scene. Sano stated that it would
have been difficult to eliminate an accidental cause of fire. 
            Captain Sano testified that Lawson told him the fire alarm was not working, but he admitted
that he did not include the information in his report. Sano accepted Lawson’s statement that the
alarm was not working and did not investigate further. Sano did not ask Ortega about the alarm and
did not recall if he asked neighbors. Sano saw a styrofoam cup with a lot of cigarette butts in it, but
he did not take a photograph of the cup. Sano agreed that Lawson never admitted starting the fire
until after Sano told Lawson that he believed it was accidental. Sano stated that Lawson did not have
any visible injuries. No photographs were taken of any fire extinguishers despite Lawson’s
statement that he attempted to use one. Sano admitted that nothing about the scene of the fire would
rule out arson. Sano admitted that each of the following would be significant information in an
investigation: (1) if the version of the events the witness told Sano differed from the version of the
events that the witness told Sano’s partner; (2) information that the witness had set other fires in the
past; (3) information that the witness had mental health issues and was supposed to be taking
medication; (4) information that the witness had been in and out of psychiatric hospitals and
attempted suicide; and (5) information that the witness had tried to harm others in the past and
experienced hallucinations ordering him to start fires. Sano admitted that such information would
make the incident more suspicious. Sano stated that he did not attempt to obtain any additional
information after learning that Lawson had been convicted of arson. Although Sano thought he
might have made a wrong determination regarding the cause of the fire at Ortega’s facility, he had
no evidence to suggest otherwise. Sano stated that based on the evidence at the fire scene, he could
not rule that the fire was intentionally set. Sano would have further questioned Lawson if he had
been aware of the information that was later discovered regarding Lawson.
            Orlando Hernandez, the program manager for the state fire marshal’s office, stated that he
was trained in arson investigation, and if an eyewitness to a fire changed stories during the course
of a three hour investigation, he would gather as much information as he could, he would not
promise the witness that the witness would not be charged, and he would not suggest that the fire
was an accident. If a witness stated that a fire was an accident after the investigator suggested the
possibility, Hernandez would continue to investigate to determine if evidence corroborated the story. 
Hernandez would continue to explore the case as a possible arson and would check the criminal
history of the witness. Hernandez would prepare a report based on the actions he had taken. 
Hernandez stated that if he subsequently became aware of information that would lead him to
suspect that a fire ruled to be accidental might be the result of arson, he could not go back and
change the ruling because the fire scene would no longer exist. Because the ruling could not be
changed, Hernandez agreed that care must be taken in reaching the initial ruling, and a decision
should not be rushed. 
            Theopholus Agbuke owned Reliance Home Health Incorporated, a home health care agency, 
that provided services to the residents at Ortega’s facility. Agbuke acknowledged a medical record
dated July 1, 1998, for Charles Pitts in which a registered nurse for Reliance Home Health cautioned
about the patient’s smoking habits, the need to keep paths free, to maintain fire alarms, and to have
a fire plan in place. Agbuke also acknowledged a second record for the patient dated September 15,
1998, in which the caregiver was instructed on the need to have a fire plan and the need to ensure
that fire extinguishers are in good working order. Agbuke testified that all of the patients residing
at Ortega’s facility were appropriate patients for the facility.
            Adelia Rodriguez, a licensed vocational nurse for thirty-five years, worked at Ortega’s
facility in 1997 as the facility caretaker. Her job responsibilities included caring for the patients and
dispensing medication. Rodriguez stated that Ramona Martinez, Rosa Borja, Dalton Albright,
Charles Cully, and Charles Pitts needed assistance in walking around and getting in and out of bed. 
All would have required assistance in getting out of the facility in the event of an emergency. 
Rodriguez stated that although Ortega prohibited smoking inside the house, Pitts smoked inside, and
Ortega knew that he smoked inside the house. Rodriguez stated that she never saw a fire plan posted
and never practiced an evacuation. Rodriguez was never shown how to open the burglar bars. The
fire alarm and smoke detectors were never activated while she worked at the facility. Rodriguez
testified that the patients were well-cared for at the facility. Rodriguez recalled being introduced to
a man from the State on one occasion while working at the facility. Rodriguez recalled Ortega
making a statement about whether she had too many non-ambulatory residents at the time the man
from the State visited. Rodriguez agreed that she did not mention Ortega’s statement in the
statement she gave to the district attorney’s office in 2001.
            Melinda Paniagua, a long-time friend of Ortega, assisted in bathing and feeding the residents
of Ortega’s facility. Paniagua stated that Ramona Martinez and Charles Cully had to be assisted in
walking. Rosa Borja and Charles Pitts could not walk. Dalton Albright and John Conner could walk
and get in and out of bed. Paniagua testified that Lawson performed janitorial work at the facility. 
Paniagua stated that Ortega and the nurses from Reliance Home Health taught her fire safety and
how to evacuate patients. Paniagua stated that they never practiced evacuating patients but would
talk about it. Paniagua identified a fire plan that she stated was posted on the walls of Ortega’s
facility.
            John Lawson testified that he had been convicted of first degree arson in West Virginia. In
connection with the conviction, a third degree arson charge was dismissed. Lawson had also been
convicted of misdemeanor theft and prowling. Lawson had been working at Ortega’s facility for
approximately one month prior to the fire. Lawson assisted with patients and housework at Ortega’s
facility. Lawson would stay overnight to care for the patients and would assist in bathing the patients
and giving them medication. Lawson did not have any formal training. Lawson never practiced
evacuating the patients and was never shown how to open the burglar bars. Lawson testified that
Ramona Martinez, Rosa Borja, Charles Culley, and Charles Pitts could not walk or get out of bed
on their own. Dalton Albright could get around by using a walker, and John Conner was able to
walk on his own. Lawson recalled a fire alarm sounding one time while he worked at the facility,
but Lawson did not recall a fire alarm or smoke detectors sounding on the date of the fire. Lawson
stated that he had been diagnosed with various mental conditions and had made numerous suicide
attempts. Lawson did not disclose his mental condition to Ortega or his need to take medication. 
Lawson also never told Ortega that he would hear voices and have hallucinations.
            Alicia Anderson, who lived across the street from Ortega’s facility, testified that she heard
an alarm on the night of the fire. Lawson told her not to enter the facility because it was on fire.
             Tonya McKenzie was employed by Reliance Home Health as a registered nurse. McKenzie
was unaware that Ortega’s facility was not licensed until the fire. McKenzie had questioned Ortega
about the burglar bars, and Ortega informed her that she had a key to unlock them. McKenzie and
Ortega discussed that a worker needed to be present the entire time a patient was smoking. 
McKenzie reviewed the medical records and testified that Rosa Borja, Ramona Martinez, Charles
Pitts, and Charles Cully were non-ambulatory. McKenzie testified that Ortega’s facility was very
clean, and the patients were given good care.
            Jack Bryant, a branch manager for a fire alarm installing company, testified that Ortega
purchased two agreements in 1995 for the installation and inspection of a fire alarm system. After
the system was installed, Ortega did not permit the company to perform the inspections. Bryant
wrote a letter to the city fire marshal informing him that Ortega would not permit the company to
inspect the fire alarm system. 
            Norma Jean Farley, a deputy medical examiner, testified that Ramona Martinez died on the
day of the fire from a combination of inhaling smoke and soot and burns to her body. Rosa Borja
also died on the day of the fire from thermal burns to sixty percent of her body and severe inhalation
injuries. Dalton Albright died from complications of thermal burns to his body a few days after the
fire. Gina Ann Gray was the attending trauma surgeon on the night of the fire. Based on the medical
records, Gray stated that the deaths of Dalton Albright, Rose Borja, Charles Pitts, and John Connor
were all caused by the injuries they sustained as a result of the fire.
            We conclude that the foregoing evidence is factually sufficient to support the conviction. 
Ortega housed several non-ambulatory patients in an unlicensed facility that, if licensed, would have
required a sprinkler system. A sprinkler system would have contained the fire to a room in which
no residents were sleeping. Ortega’s failure to have a doorknob on one of the bedroom doors
impeded the fire fighter’s rescue attempts. Ortega failed to properly staff the facility and failed to
take measures to ensure that the residents could be properly evacuated in the event of a fire by failing
to conduct necessary fire drills.
            Ortega’s second issue is overruled.
Constitutional Issues
            In her first issue, Ortega contends that the trial court violated her constitutional rights because
it denied her proper cross-examination and confrontation. The crux of Ortega’s complaint is the trial
court’s refusal to allow defense counsel to question Lawson about a statement he gave to police after
his arrest in West Virginia in which he admits starting six other fires. Ortega contends that Lawson
waived his Fifth Amendment privilege by testifying regarding his employment by Ortega and that
Ortega’s Sixth Amendment rights were superior to Lawson’s Fifth Amendment rights.
            In a criminal prosecution, the accused’s right to compulsory process under the Sixth
Amendment does not override a potential witness’s Fifth Amendment right against self-incrimination. See Bridge v. State, 726 S.W.2d 558, 567 (Tex. Crim. App. 1986); Suarez v. State,
31 S.W.3d 323, 329 (Tex. App.—San Antonio 2000, no pet.). Accordingly, Ortega’s Sixth
Amendment rights were not superior to Lawson’s Fifth Amendment Rights.
            A trial court is relieved of any obligation to determine whether a witness’s assertion of the
Fifth Amendment privilege is valid if the trial court is informed that a witness intends to invoke the
privilege at the advice of counsel. Suarez, 31 S.W.3d at 329. By testifying on one subject, a witness
does not waive his privilege on all subjects. Stephens v. State, 59 S.W.3d 377, 380 (Tex.
App.—Houston [1st Dist.] 2001, pet. ref’d). “As to each question to which a claim of privilege is
directed, the court must determine whether the answer to that particular question would subject the
witness to a ‘real danger’ of further crimination.” Rogers v. United States, 340 U.S. 367, 374 (1951);
see also Stephens, 59 S.W.3d at 380. Lawson’s general testimony regarding his employment by
Ortega is vastly different from testimony regarding the actions he may have taken in regard to the
fire at Ortega’s facility or in regard to starting other fires. The latter testimony would subject
Lawson to “a ‘real danger’ of further crimination.” Rogers, 340 U.S. at 374. Therefore, Lawson did
not waive his Fifth Amendment rights with regard to those questions, and since Lawson invoked his
rights on the advice of counsel, the trial court was not required to make any further determination
of whether his assertion of the privilege was valid.
            Ortega also complains that the trial court’s exclusion of Lawson’s statement to the police
violated her constitutional rights by preventing her from presenting her defensive theory. The
erroneous exclusion of evidence is only of constitutional dimension if it significantly undermines
fundamental elements of the accused’s defense. Potier v. State, 68 S.W.3d 657, 666 (Tex. Crim.
App. 2002). A defendant’s inability to present his case “to the extent and in the form he desired is
not prejudicial where, as here, he was not prevented from presenting the substance of his defense to
the jury.” Id. In his statement, Lawson admits, “I have set about 6 fires in my lifetime.” This
statement would have been additional evidence from which the jury could infer that Lawson
intentionally set the fire at Ortega’s facility; however, other testimony admitted through cross-examination also would have enabled the jury to make this inference. Assuming the trial court erred
in excluding the statement, the exclusion only affected the extent to which Ortega was able to present
her defense and did not prevent her from presenting the substance of her defense to the jury. 
Accordingly, Ortega’s constitutional rights were not violated.
            Ortega’s first issue is overruled.
Deposition Testimony
            In her third issue, Ortega contends that the trial court erred in admitting her deposition
testimony taken in a civil suit filed by the estates of two of the deceased residents. Ortega asserts
that the deposition was not admissible under Chapter 39 of the Texas Code of Criminal Procedure.
            We review the trial court’s rulings concerning the admissibility of evidence under an abuse
of discretion standard. Montgomery v. State, 810 S.W.2d 372, 387, 391 (Tex. Crim. App.1991). As
long as the trial court’s ruling was within the zone of reasonable disagreement, we will not interfere
with the ruling. Id.
            The Houston court of appeals addressed the admissibility of civil depositions in a criminal
proceeding in Kemmerer v. State, 113 S.W.3d 513, 516 (Tex. App.—Houston [1st Dist.] 2003, pet.
ref’d). In that case, the appellant argued that the trial court erred in admitting a redacted version of
her deposition taken during prior civil litigation. The deposition was taken in what appeared to be
a wrongful-death suit filed against the appellant. Id. at 516 n.5. “At the time of the deposition,
appellant was being investigated, but had not yet been informed of the criminal investigation.” Id.
at 516. The Houston court construed appellant’s argument to be “that civil depositions may not be
used in criminal trials unless they were taken in accordance with chapter 39 of the Texas Code of
Criminal Procedure.” Id.
            The Houston court noted that the language of Chapter 39 indicated that it governed the taking
of depositions in criminal cases and the use of those depositions in criminal proceedings. Id. at 517. 
“Nowhere does Chapter 39 discuss the taking of depositions in civil cases, and the chapter’s
language does not appear to concern the admissibility in criminal cases of depositions taken in civil
proceedings.” Id. The Houston court then noted that Rule of Evidence 804(b)(1), which creates
certain exceptions to the rule excluding hearsay, incorporates Chapter 39 by reference. Id. Rule
804(b)(1) excludes the following former testimony from the hearsay rule if the declarant is
unavailable as a witness:
In civil cases, testimony given as a witness at another hearing of the same or a
different proceeding, or in a deposition taken in the course of another proceeding, if
the party against whom the testimony is now offered, or a person with a similar
interest, had an opportunity and similar motive to develop the testimony by direct,
cross, or redirect examination. In criminal cases, testimony given as a witness at
another hearing of the same or a different proceeding, if the party against whom the
testimony is now offered had an opportunity and similar motive to develop the
testimony by direct, cross, or redirect examination. In criminal cases the use of
depositions is controlled by Chapter 39 of the Code of Criminal Procedure.

The appellant argued that Rule 804(b)(1) should be interpreted to require that any civil depositions,
including one that is not itself hearsay, must meet all of Chapter 39’s requirements before it can be
used in a criminal proceeding. The State argued that Rule 804(b)(1) only applied if the deposition
testimony itself is hearsay. The Houston court held that Chapter 39 as referenced in Rule 804(b)(1)
did not apply to the appellant’s own civil-deposition testimony when used against her at her criminal
trial because that testimony was not hearsay. Id. at 517. The court noted that a statement is not
hearsay if it is offered against a party and is the party’s own statement. Id. Since the deposition was
not hearsay, no hearsay exception was needed, making Rule 804(b)(1) and its reference to Chapter
39 “irrelevant.” Id. at 518.
            We agree with the reasoning in Kemmerer and overrule Ortega’s third issue.
Causation Instruction
            An accused may be exonerated under Section 6.04(a) of the Texas Penal Code “only if the
concurrent cause was clearly sufficient, operating alone, to produce the result and the accused’s
conduct alone was clearly insufficient to do so.” McFarland v. State, 928 S.W.2d 482, 516 (Tex.
Crim. App. 1996) (emphasis in original). A defendant is entitled to an instruction on any properly
requested defensive issue raised by the evidence, regardless of whether the evidence is weak or
strong, unimpeached or contradicted, or credible or not credible. Granger v. State, 3 S.W.3d 36, 38
(Tex. Crim. App. 1999). In this case, we agree that the evidence did not entitle Ortega to a causation
instruction. Several witnesses testified that more than one resident at Ortega’s facility was non-ambulatory. As a result, several witnesses testified that Ortega’s facility was required to be equipped
with a sprinkler system. In addition, witnesses testified that a sprinkler system would have contained
the fire within the room of origin, where none of the residents were sleeping, and would have
enabled the residents to be safely evacuated. Therefore, whether the fire was accidentally or
intentionally started, the fire would not have caused the type of injuries to the residents if Ortega had
not been reckless in failing to properly equip the residence and provide sufficient staffing to evacuate
the residents. Because Lawson’s conduct was not clearly sufficient, operating alone, to produce the
result and because Ortega’s conduct alone was not clearly insufficient to produce the result, the trial
court properly denied the requested instruction on causation.
            Moreover, Ortega’s argument in her brief that the instruction should have been given because
“the probable actions of Lawson [vitiated] any liability on [her] part” appears to be an argument in
support of alternative causation, not concurrent causation. See Barnette v. State, 709 S.W.2d 650,
652 (Tex. Crim. App. 1986); Mills v. State, 802 S.W.2d 400, 405 (Tex. App.—Houston [1st Dist.]
1991, pet. ref’d). Arguing that Ortega should be acquitted because Lawson’s actions caused the
injuries to the residents simply negates the causation element the State was required to prove in
relation to the charged offense; it does not present a separate statutory defense. 
Conclusion
            The trial court’s judgment is affirmed.
 
Catherine Stone, Justice

DO NOT PUBLISH